Doran Investments, Appellant, *v.* Muhlenberg Township Board of Commissioners and Muhlenberg Township Concerned Citizens Association, Appellees. Philadelphia Home Builders Association, Amicus Curiae.

Argued June 5, 1973, before President Judge Bow-MAN and Judges CRUMLISH, JR., KRAMER, WILKINSON, JR., MENCER, ROGERS and BLATT.

*Joseph E. DeSantis*, with him *Brett A. Huckabee* and *McGavin, DeSantis & Koch*, for appellant.

*G. Alan Kramer*, with him *Emmanuel H. Dimitriou* and *Lieberman, Dimitriou & Kramer*, for appellee, Township.

*Bernard Mendelsohn*, with him *Baskin, Mendelsohn & Leisawitz*, for appellee, Citizens.

*John P. Trevaskis, Jr.*, with him *J. Scott Calkins, Trevaskis, Doyle, Currie, Nolan & Bunting* and *Shaffer, Calkins & Balaban*, for Amicus Curiae.

OPINION BY JUDGE ROGERS, September 11, 1973:

This case concerns planned residential developments provided for by Article VII of the Pennsylvania Municipalities Planning Code (MPC), Act of July 31, 1968, P. L. 805, as amended, 53 P.S. §10701 et seq. It presents important questions concerning the power of governing bodies to withhold tentative approval of plans which conform to planned residential development ordinances enacted pursuant to Article VII.

Appellant, Doran Investments, a limited partnership primarily engaged in real estate investment, applied to the Muhlenberg Township, Berks County, Board of Commissioners for tentative approval of a planned residential development pursuant to the township's legislation on the subject, denominated, and sometimes hereinafter referred to as, Ordinance No. 106. Doran's development would consist of 14 single family homes, 56 garden apartment rental units, and 133 town house rental units located on some 45 acres, of which 10 acres bordering a creek will be left as open space for recreational use. Muhlenberg Township has a comprehensive plan and a zoning ordinance. The Doran tract is located in an area proposed by the comprehensive plan for medium density residential use. It is located in a zoning district permitting single family dwellings on 8000 square foot lots. As required by Sections 109(a) and (b) of Ordinance No. 106, Doran submitted its plan for review and study by the township planning commission and the Berks County planning commission, both of which recommended that tentative approval be granted subject to certain conditions. After public hearings at which numerous residents appeared and vigorously objected to the approval of the proposed development, the board of township commissioners refused tentative approval. Doran appealed to the Court of Common Pleas of Berks County which concluded that the board had not made sufficient findings

of fact as required by Section 709 of the MPC, 53 P.S. §10709, and remanded the record for this purpose. The board, without receiving additional evidence, made an amended decision, with additional findings, again denying tentative approval. On appeal the court below affirmed the commissioners and Doran appeals here.

The commissioners disapproved the plan for the expressed reasons that it was inconsistent with the township's comprehensive plan, that it was not in compliance with requirements of the township zoning ordinance, and for additional reasons, including its asserted lack of provision for anticipated traffic congestion and hazards and protection of the "visual enjoyment" of adjacent property owners, its alleged encroachment on land proposed by township planners for future school use, and because it would create "an island . . . of development substantially different in character and visible appearance from the surrounding residential area."

The court below correctly determined that, not having taken additional testimony, its duty was to determine whether the board of commissioners abused their discretion or committed an error of law. *Brauns v. Swarthmore Borough*, 4 Pa. Commonwealth Ct. 627, 288 A. 2d 830 (1972); *DeFeo et al. v. Brookhaven Borough*, 3 Pa. Commonwealth Ct. 377, 283 A. 2d 505 (1971). Ours is the same duty.

Doran contends that its plan complies with all of the requirements of Ordinance No. 106 and that it is entitled to have its plan tentatively approved.

The Legislature enacted Article VII of the MPC, 53 P.S. §10701 et seq., to encourage "innovations in residential development and renewal so that the growing demand for housing [in Pennsylvania] may be met by greater variety in type, design and layout of dwellings and by the conservation and more efficient use of open space." MPC §701, 53 P.S. §10701. In enacting

the ordinance authorized by Article VII, municipal governing bodies are to fix "standards and conditions for planned residential development." MPC §702, 53 P.S. §10702. Ordinance No. 106 of Muhlenberg Township was adopted for these purposes and fixed standards and conditions.

Article VII of the MPC also outlines a comprehensive scheme whereby a developer may obtain approval of a proposed planned residential development from the local governing body.[1] As we said in *Abel v. Town-*

---

[1] By way of historical review: *Eves v. Zoning Board of Adjustment*, 401 Pa. 211, 164 A. 2d 7 (1960), invalidated an ordinance which created a so-called "floating zone" for light industrial uses, that is, a zoning classification to be applied to tracts as landowners come forward requesting that their properties be rezoned to that classification. The scheme was struck down (1) as being the antithesis of zoning in accordance with a comprehensive plan and (2) as harboring the evils of spot zoning. In *Village 2 at New Hope, Inc. Appeals*, 429 Pa. 626, 241 A. 2d 81 (1968), the municipality adopted an ordinance creating a new zoning district, called "planned unit development," and the same day adopted a second ordinance rezoning a developer's tract to the new classification. The Supreme Court concluded that an *Eves* "floating zone" problem did not arise because (1) "[o]n the very day that the PUD district was created by ordinance 160, it was brought to earth by ordinance 161 . . ." and (2) the second ordinance amended the zoning map and the municipality's action was, therefore, in accord with a comprehensive plan. A few months subsequent to *Village 2 at New Hope*, the Legislature passed Article VII of the MPC which permits municipalities to adopt ordinances allowing for "planned residential developments," with a mix of types of residential uses and of some commercial uses on a single tract, in specific locations, as in *Village 2 at New Hope* or, as the Muhlenberg Ordinance, 106 provides, anywhere in the municipality. The practice of case by case consideration condemned in *Eves* is overcome by the requirement that detailed development standards appear in the planned residential development ordinance and by assuming that compliance with those standards would lead to aproval, subject to the additional feature, not usually present in conventional zoning, that the local planners may attach conditions conducive to the public interest. If Article VII of the MPC were

*ship of Middletown,* 7 Pa. Commonwealth Ct. 6, 297 A. 2d 525 (1972), it envisions a two-step procedure. The first step is the one taken by the appellant here, an "[a]pplication for tentative approval" pursuant to Section 707 of the MPC, 53 P.S. §10707. Public hearings on the application for tentative approval are required by Section 708, 53 P.S. §10708. Findings must be made pursuant to Section 709, 53 P.S. §10709, which reads:

"(a) The governing body within thirty days following the conclusion of the public hearing provided for in this article, shall, by official written communication, to the landowner, either:

"(1) Grant tentative approval of the development plan as submitted;

"(2) Grant tentative approval subject to specified conditions not included in the development plan as submitted; or

"(3) Deny tentative approval to the development plan.

. . . .

"(b) The grant or denial of tentative approval by official written communication shall include not only conclusions but also findings of fact related to the specific proposal and shall set forth the reasons for the grant, with or without conditions, or for the denial, and said communication shall set forth with particularity in what respects the development plan would or would not be in the public interest including but not limited to findings of fact and conclusions on the following:

---

to be construed to mean that a plan adhering to the standards of the ordinance may be disapproved by the governing body whenever it concludes for any reason that the plan is not in the public interest, the legislation would be identical to that struck down in *Eves.* Where a choice is present, courts will adopt a construction which will render legislation constitutional, not one which raises constitutional questions.

"(1) In those respects in which the development plan is or is not consistent with the comprehensive plan for the development of the municipality;

"(2) The extent to which the development plan departs from zoning and subdivision regulations otherwise applicable to the subject property, including but not limited to density, bulk and use, and the reasons why such departures are or are not deemed to be in the public interest;

"(3) The purpose, location and amount of the common open space in the planned residential development, the reliability of the proposals for maintenance and conservation of the common open space, and the adequacy or inadequacy of the amount and purpose of the common open space as related to the proposed density and type of residential development;

"(4) The physical design of the development plan and the manner in which said design does or does not make adequate provision for public services, provide adequate control over vehicular traffic, and further the amenities of light and air, recreation and visual enjoyment;

"(5) The relationship, beneficial or adverse, of the proposed planned residential development to the neighborhood in which it is proposed to be established; and

"(6) In the case of a development plan which proposes development over a period of years, the sufficiency of the terms and conditions intended to protect the interest of the public and of the residents of the planned residential development in the integrity of the development plan."

Under Ordinance No. 106 the minimum land area required for a planned unit development is 45 acres; the Doran tract measures 45.222 acres. The overall density planned by Doran will be 4.5 dwelling units per acre, the exact density permitted by the ordinance. The particular densities planned for the town house

and apartment areas, 5.648 and 8.7 dwelling units per acre respectively, are well within the permitted figures of 10 and 12 units per acre. The plan also more than meets the minimum requirements established as to minimum lot size for single family homes, building coverage, and off-street parking. The site is served by public sewer and water facilities as required by the ordinance. The planned development will meet the rather specific requirements of Ordinance No. 106 for the grouping of town houses and apartments, and views from existing homes on the south and east edges of the Doran tract are proposed to be protected by the erection of dense evergreen barriers. Ordinance No. 106 does not deal in specifics with traffic within the project or in its vicinity.[2] It does require that roads and streets comply with "all applicable Township ordinances and regulations including . . . the Township Zoning Ordinance and Subdivision Regulations." There is no evidence that all township regulations were not complied with. The neighbors' fears of congestion expressed at the public hearings were most general and would be equally applicable to a development of the site in single family homes as permitted by the zoning ordinance.

Despite the plan's conformity to the standards of Ordinance No. 106, and despite the favorable recommendation of the township and Berks County planning commissions, the board of commissioners refused tentative approval. We have carefully examined the record and the law and find nothing to justify such a decision. We will, however, attempt to deal with the commissioners' reasons as expressed for disapproving this application. In so doing, we will follow the format of the commissioners' decision, discussing under separate headings the six subjects for findings and conclusions prescribed by Section 709(b) of the MPC:

---

[2] Most of the roads within the development are proposed as private ways to be maintained by the developer.

THOSE RESPECTS IN WHICH THE DEVELOPMENT PLAN IS
OR IS NOT CONSISTENT WITH THE COMPREHENSIVE PLAN
. . . OF THE MUNICIPALITY

The Board found that the plan proposed a "high density" use in an area not suggested by the comprehensive plan for such use, and further that the Doran plan encroached on land proposed for school use in the comprehensive plan. Whether the project is actually high density is questionable since the number of dwelling units per acre planned are not more than would be possible to be placed on the tract under the present R-2 "medium density" zoning. The township's comprehensive plan suggests five areas, not including the Doran tract, for so-called high density and at the same place it suggests planned unit development as a more desirable high density use than high rise apartments. It does not say that all planned developments are high density uses.

The argument that the proposed development will encroach on land set aside for future school use falls in the face of the holding of *Miller v. Beaver Falls*, 368 Pa. 189, 82 A. 2d 34 (1951), that land may not be withheld from private use because the public may later want it.

The Supreme Court in *Village 2 at New Hope, Inc. Appeals*, 429 Pa. 626, 632-33, 241 A. 2d 81, 84 (1968), stated, regarding the relationship between the comprehensive plan and an ordinance permitting a planned unit development: "The fallacy in the court's reasoning lies in its mistaken belief that a comprehensive plan, once established, is forever binding on the municipality and can never be amended. Cases subsequent to Eves have made it clear, however, that these plans may be changed by the passage of new zoning ordinances, provided the local legislature passes the new ordinance with some demonstration of sensitivity to the commu-

nity as a whole, and the impact that the new ordinance will have on this community. As Mr. Chief Justice BELL so artfully stated in Furniss v. Lower Merion Twp., 412 Pa. 404, 406, 194 A. 2d 926, 927 (1963): 'It is a matter of common sense and reality that a comprehensive plan is not like the law of the Medes and the Persians; it must be subject to reasonable change from time to time as conditions in an area or a township or a large neighborhood change.' *This salutary rule that comprehensive plans may be later amended by the passage of new zoning ordinances has been approved not only in* Furniss, *but also in* Donahue v. Zoning Bd. of Adjustment, 412 Pa. 332, 194 A. 2d 610 (1963) and Key Realty Co. Zoning Case, 408 Pa. 98, 182 A. 2d 187 (1962)." (Emphasis supplied.) In *Morelli v. Borough of St. Marys,* 1 Pa. Commonwealth Ct. 612, 617, 275 A. 2d 889, 891-892 (1971), this Court wrote: "The comprehensive plan does not have the legal effect of a zoning ordinance, which actually regulates the land use as may be recommended by the comprehensive plan. The planning commission may recommend all kinds of desirable approaches to land utilization and development. Not all of these may become eventually legally enforceable in a zoning ordinance. In other words, a comprehensive plan is abstract and recommendatory; whereas the zoning ordinance is specific and regulatory." We recently held that the approval of a subdivision plan for a mobile home park by the Berks County planning commission was not unlawful merely because of a conflict with the county's comprehensive plan which designated the area in question as low density and forest preserve. *Saenger v. Planning Commission of Berks County,* 9 Pa. Commonwealth Ct. 499, 308 A. 2d 175 (1973).

Ordinance No. 106 by providing for planned residential developments without limitation as to location authorizes that use throughout the township. The provision of Ordinance No. 106 and of Section 703 of the

154

MPC, 53 P.S. §10703, that the ordinance and every application for approval of a planned residential development "shall be based on and interpreted in relation to the comprehensive plan," do not mean that the ordinance and such application are to be controlled by the comprehensive plan. Such an interpretation would give the comprehensive plan a force and effect that it simply does not possess under Pennsylvania law. As *Village 2 at New Hope* teaches, Ordinance No. 106 can be taken as amending the comprehensive plan.

THE EXTENT TO WHICH THE DEVELOPMENT PLAN DEPARTS FROM ZONING . . . REGULATIONS. . . .

The board of commissioners found that the Doran plan departed from certain zoning requirements and that such departures were not in the public interest. Of course, Ordinance No. 106 departed from zoning regulations in the same respects. Doran contends that departures from zoning regulations by adherence with planned development requirements cannot be grounds for disapproving its plan.

Support for Doran's position can be found in Ordinance No. 106 itself which, by Section 110.2 provides: "All existing ordinances or parts of ordinances which are contrary to the provisions of this ordinance are hereby repealed to the extent necessary to give this ordinance full force and effect." Furthermore, the legislative mandate by Article VII of the MPC is that a planned residential development must be judged by the standards set forth in a planned residential development ordinance and those standards may vary from the requirements of a municipality's zoning ordinance. Section 705 of the MPC, 53 P.S. §10705, reads: "Every ordinance adopted pursuant to the provisions of this article shall set forth all the standards, conditions and regulations by which a proposed planned residential development shall be evaluated. . . ." Section 705(b) specifically provides:

"The ordinance adopted pursuant to this article shall establish standards governing the density, or intensity of land use, in a planned residential development. *The standards may vary the density or intensity of land use, otherwise applicable to the land under the provisions of a zoning ordinance of the municipality within the planned residential development* in consideration of:

"(1) The amount, location and proposed use of common open space;

"(2) The location and physical characteristics of the site of the proposed planned residential development; and

"(3) The location, design, type and use of structures proposed." (Emphasis supplied.) It is the very essence of a planned residential development that it may diverge from zoning requirements.[3] As Judge SHADLE, whose opinion, appearing at 85 York L. R. 193 (1972), we adopted in *Dillsburg Borough Council v. Gettys*, 7 Pa. Commonwealth Ct. 519, 300 A. 2d 805 (1973), expressed it: ". . . [A] 'planned residential development' cannot exist except as a modification of an existing zoning ordinance. . . ." Additional support for the conclusion that the regulations of the planned residential ordinance should be the exclusive standards to be applied unless otherwise provided in the ordinance itself is found in the following language in Section 707 of the MPC, 53 P.S. §10707:

*"In order to provide an expeditious method for processing a development plan for a planned residential development under the terms of an ordinance adopted pursuant to the powers granted herein, and to avoid*

---

[3] A fact recognized by Section 709(b) of the MPC which requires that the written communication of the governing body in response to the plan shall set forth inconsistencies with and departures from the comprehensive plan and the zoning ordinance even where the plan is approved.

156

*the delay and uncertainty which would arise if it were necessary to secure approval, by a multiplicity of local procedures, of a plat of subdivision as well as approval of a change in the zoning regulations otherwise applicable to the property,* it is hereby declared to be in the public interest that all procedures with respect to the approval or disapproval of a development plan for a planned residential development and the continuing administration thereof shall be consistent with the following provisions.

. . . .

"(6) The application for and tentative and final approval of a development plan for a planned residential development prescribed in this article shall be in lieu of all other procedures or approvals, otherwise required pursuant to Article V and VI of this act." (Emphasis supplied.)

The commissioners' reply that Ordinance No. 106 supersedes existing zoning requirements only if and when a specific plan is approved would effectively write Article VII out of the MPC. It is true that existing zoning regulations continue to apply to the land included in a proposed planned residential development until the development plan receives final approval and is filed of record. Section 711(d) of the MPC, 53 P.S. §10711(d). It is not true that a planned residential development is to be judged by the standards of the zoning ordinance.

We note that if a township were allowed to disapprove a planned residential development merely because it would "destroy the integrity of the R-2 zoning in the area," it is doubtful that such a development could be placed anywhere. Nor has the board explained why the departures from zoning regulations are not in the public interest except in the single case of asserted deficiencies in side yard requirements, assertedly ascertained by scaling the plan, which would also be departures from Ordinance No. 106 standards on the same

subject. There is general testimony of witnesses for Doran that all Ordinance No. 106 standards were observed and Doran repeatedly expresed its intention to observe all regulations of that Ordinace and all other conditions which might be imposed. At most these apparently inadvertent discrepancies, if they in fact exist, should have been the subject of a condition to tentative approval.

## THE PURPOSE, LOCATION AND AMOUNT OF THE COMMON OPEN SPACE . . .

Doran has in fact set aside 9.4 acres for development as common open space, an area in excess of the 20 percent required under Ordinance No. 106. The board admitted that the plan meets the requirements of the common open space provisions of the ordinance, but concluded that the "proposed development of Laurel Run Creek will result in a reduction in the amount of actual usable recreational area. . . ." The board does not explain how the creek's development will reduce recreational space. We may, however, infer, that since some of this privately owned land is to be reserved for the use of the tenants in the project, the board's objection is that the developer is not providing a public park. The board might have attempted to acquire public recreation grounds in this fashion by discussion with the developer; it may not under our constitution make dedication of land a condition precedent to its approval of a lawful use.

## THE PHYSICAL DESIGNS OF THE DEVELOPMENT PLAN AND THE MANNER IN WHICH SAID DESIGN DOES OR DOES NOT MAKE ADEQUATE PROVISION FOR PUBLIC SERVICES, PROVIDE ADEQUATE CONTROL OVER VEHICULAR TRAFFIC, AND FURTHER THE AMENITIES OF LIGHT AND AIR, RECREATION AND VISUAL ENJOYMENT

The board's findings regarding the plan's provision for public services, traffic, and the amenities of light

and air, recreation and visual enjoyment are wholly inadequate. Again, the board does not tell us why, for example, a traffic hazard would result or exactly why Doran's significant provisions for these matters are not adequate. Specifically, it has been rightly said that a traffic increase with its attendant noise, dirt, and hazards is an inevitable accompaniment of suburban progress and of our constantly expanding population which, standing alone, does not constitute sufficient reason to refuse a property owner the legitimate use of his land. *Archbishop O'Hara's Appeal*, 389 Pa. 35, 131 A. 2d 587 (1957).

The board found that the visual enjoyment of the neighbors of the project would be impaired by there being views of "unsightly asphalt parking areas with attendant automobiles, traffic, headlights, noise and movement." The same result would obtain from any use of the tract. The board further on this subject concluded that, due to departure from unspecified zoning requirements, the amenities of light and air would be adversely affected. This is hardly a setting forth "with particularity" of the way in which the plan would affect these public interests as Section 709(a)(4) requires.

THE RELATIONSHIP, BENEFICIAL OR ADVERSE, OF THE PROPOSED PLANNED RESIDENTIAL DEVELOPMENT TO THE NEIGHBORHOOD IN WHICH IT IS PROPOSED TO BE ESTABLISHED

Although Doran went to some pains to show that values of single family homes near a large apartment house in the township and in another location had continued to increase, the board concluded that there was insufficient evidence for it to make any finding on the effect of the project on property values. Its finding that the project would be an "island . . . substantially different in character and visible appearance from the

surrounding area" of single family homes does not *ipso facto* demonstrate that the project will have an adverse effect on the neighborhood. A planned residential development is by its very nature visually different from the usual lot by lot development dictated by so-called "euclidean" zoning. Again, if the board is to be permitted to disapprove a planned residential development on this basis, its Ordinance No. 106 would be virtually nullified.

THE SUFFICIENCY OF THE TERMS AND CONDITIONS INTENDED TO PROTECT THE INTERESTS OF THE PUBLIC AND THE RESIDENTS IN THE INTEGRITY OF THE DEVELOPMENT PLAN

Here again the board indulges for the most part in vague generalities. Its only concrete criticism is that there was "no statement of proposed financing [required by Section 109.1(f)(10) of Ordinance No. 106] in sufficient form . . . to be evaluated." Section 109.1 (f)(10) simply states that the plan shall include a "[s]tatement of the proposed financing of the plan"; precisely what goes into the statement is left to the developer's imagination. Eric Gerst, the general partner of Doran, testified that the development would be financed with a "conventional mortgage." Leon Gerst, his father, the limited partner, plainly implied that he was a person of means. The board at that time could have, but did not, request further details of the financing. The developer repeatedly expressed its willingness to answer any inquiries of the board and to comply with any requirement it might make.

We thus hold that *this* governing body in denying tentative approval to *this* conforming Article VII plan abused the discretion allowed it by the statutes. We do not decide that in no case may a conforming plan be denied tentative approval; for it is possible that the circumstances of a particular matter might be so ex-

160

ceptional as to support the conclusion that the plan in one or more respects, stated "with particularity," would not be in the public interest.

The record would justify a direction that the plan be tentatively approved, conditioned only upon proof of compliance with the yard requirements of Section 107.3(a) of Ordinance No. 106. Since, however, some of the issues we have dealt with are of first impression we believe fairness indicates that we should afford the commissioners of Muhlenberg Township the opportunity to look in this proposal not for grounds upon which it might be denied but for specific conditions which might in the public interest be attached to its grant. We therefore make the following order:

The order of the court below is reversed; the record is remitted with the direction that the plan of Doran Investments be granted tentative approval subject to its compliance with the requirements of Section 107.3 (a) of Muhlenberg Township Ordinance No. 106 and subject to such other specified conditions not included in the development plan as submitted as the township's commissioners shall require; provided, however, that such added conditions shall be reasonable and economically feasible.